Honorable members of the United States Court of Appeals before the Deputy Attorney General, dearly, dearly, dearly, all friends and family members of the Honorable Court are invited to the honorarium at their home in the Court of Justice. God bless the United States and His Honorable Court. Good morning, everyone. We have five cases on today's argument calendar, and we'll begin with the appeal in number 24, 1733. Trover on behalf of the estate of Donald Gaddis v. Craig Oglesby and others. Mr. Dunham, good morning. Nice to see you whenever you're ready. May it please the Court, my name is Daryl Dunham. I'm representing the plaintiff. Marleis Trover is the administrator of the estate of Donald Gaddis. I'm going to try to be very short on the facts. The facts are that on March 20th, 2022, Donald Gaddis, I might call him my client even though he's deceased, and should also say that his passing doesn't have anything to do with this lawsuit, not germane to that, came onto the property of one Brian Damati, and his friend was there, a fellow by the name of Sam Ward. They were off-duty Marion City police officers. They took a dislike to his presence, decided to affect a citizen's rest, took him to the ground, called the Williamson County Sheriff's Department, and it were upon three officers, the primary ones of Oglesby and Kelly, came to the scene and effected an arrest on Donald Gaddis. He did ask while he was in the squad car that the in-camera dashboard remain active, and insisted and asked that that be done. Oglesby said it would be. As it turns out, that in-cam dashboard material was lost. So the real principle and reason is that there's a, what the city of Marion, the defendants say, was an inventory search of Gaddis' vehicle because it was going to be impounded, take the county impound, and they wanted to have an inventory of whatever property was in the vehicle. I think that's perfectly reasonable under the circumstances. And in the course of doing the impound, they found a notebook in Gaddis' car. And here's where things, the diverse. Yeah, Mr. Dunham, in keeping with what you said in the beginning on minimizing our discussion of the facts, your account of them aligns with what I read in the briefs. No question about that. Okay. With respect to the notebook issue. Thank you. Can you describe as best you can what the alleged Fourth Amendment violation was and when did it happen? Yes, Your Honor. I think there were two violations. The first one was they went, whichever officer it was, we don't know, had no right to actually read the notebook for its content and for its material. Had a right to go through and maybe look through the pages, see if there's anything in there that needed to be in there. So the first then would be the reading of the notebook in connection with the inventory search? Correct. Okay. And you said there's a second? Then the officer went beyond and took the private notebook of my client and gave it to an off-duty police officer, took it into his house and either pointed out specific pages for that officer, that private citizen to read or gave him the notebook to read in its full because that, the demotee, that officer, that private citizen at that time doesn't recall whether he just read specific pages that were pointed out to him by the officer or he read the entire notebook. But then, of course, demotee used that information to go and file an order of protection against. Yes. So I think that those are the two violations here. Mr. Dunham, on the, so the first one seems kind of like a close case in terms of there being sort of a, okay, I'm entitled to look through and see if there are other objects hidden in this notebook and my eyes may notice certain words or names as I do that. I'd like to focus on the second violation that you've alleged and argued.  And my question is, well, suppose in the course of an inventory search, an officer encounters such a note or a notebook that says, here's a list of people I need to hurt and lists two or three names. Do you think it's a Fourth Amendment violation for the officer to warn those people about that list? And if so, is there case support for that conclusion? Of course, I might think that's a different case than ours, but I understand. Not much, but. Well, and I'm sure you've had an opportunity to look at the notebook. I have not, but I've seen the accounts. It is, the full notebook is in the record. Okay, good, thanks. And you're not going to find anything in there that indicates that my client had, there's no language in there that says he once wanted to murder anybody. Indulge my hypothetical, please. I will, and I've been here before and I've seen that you haven't let me or others get away with that. We try not to. Yeah. You know, I think that's going to have to be a very factually. One, I don't know of any case I've looked. I don't know of any case, we're talking about cases on force. I don't know of any cases. I'll take one close. I'll take a case that's close enough to defeat a qualified immunity defense here. The only cases that I were able to find that was even close were those that were cited by the district court. That I can tell you, because I did look. I think that the cases cited by the district court are easily, certainly the second case where they were looking for evidence, and in this case, and that's certainly a qualification. In this case, my client was arrested for trespass. So there was nothing in the notebook that conceivably could have been evidence to help them prove a case of trespass. And they weren't even contending that. That's not the concern. Okay. The concern is, in my hypothetical, an officer comes across information in the same way that would be of concern about a threat or implicit threat to third parties. Could I elaborate just briefly in a way that I think helps the hypothetical? Let's assume that it was Kelly. Kelly looks at the notebook and sees in bold language, I am planning to kill Lehman and Damani. Okay. Let's go that far. And it was like an advertising billboard in the notebook. I would find it hard to believe that any court, including if I ever became a judge, which I never will be, would find that that's an illegal search and that the officer was foreclosed from using that information to prompt a further investigation.  But in this case, there wasn't anything in the notebook that prompted further search. I understand your point. But the question, the challenge you face, is defeating a qualified immunity defense to that second violation, you've argued. In other words, Kelly sees something in the notebook that causes him concern, and he's afraid that he better point this out to Damani because Gaz is out to get him. Yep. Okay, I get it. There's nothing in this notebook that can conceivably meet that standard. That's the point. Look at the notebook. It's in the record. And certainly I think it's arguably an issue of fact if that was in fact the motive. There's nothing from the respondent in this case that suggested that was what Kelly's motive was. Well, both the defendants denied that they provided the information.  And so my point is, why are they denying that? Because they know it was wrong. They knew it was a violated policy at the preliminary hearing on the criminal charges. Ogilvie gets up and testifies. No, I didn't read the notebook. That would have been against the Marion County Police policy. Mr. Dunham, if you were to go to trial in this case, what would the damages be? What would the damages be? There aren't going to be any compensatory damage in terms of lost wages or the like. Frankly, we did have a similar trial in this case where the court allowed us to have emotional distress damages, and I think that would be what the damages would be. Mr. Dunham, with regard to the summary judgment record, there seems to be a big question about whether or not it was Officer Ogilvie or Officer Kelly who presented the notebook to Mr. Damati. Is there anything in the record from which a jury can conclude it was one and not the other? I think the district judge primarily pointed at Kelly. If we were to try this case in front of a jury, we would probably primarily point to Kelly. And based on what? Because he was the one that signed the inventory sheet. Okay, and how do you get from signing the inventory sheet to presenting the notebook to Mr. Damati? That's why we want to keep Ogilvie in the case. It's an unfortunate case, at least from our perspective. We think it's obvious. We've got an off-duty police officer. I understand the theory and I understand the concern, but under 1983, you have to point to a particular officer to establish that the officer was violating the constitutional rights of your client. And I'm just trying to figure out whether there's anything from which a reasonable jury can conclude it was one and not the other. I think, Your Honor, and we have cited cases primarily down below that basically hold on issues of credibility. That's something for the jury to decide. And certainly the jury could decide easily that Damati is more credible than Kelly and Ogilvie. And then I think the jury should be permitted to decide, particularly when we have Ogilvie testified in a preliminary hearing. I do think we are also saved by our spoliation argument, which we go into as briefed. And we take the position that Ogilvie had possession of in-camera dashboard material. Gaddis asked him to make sure. I don't want to have that thing destroyed. I guess, not to cut you off, but going back to my original question, if a jury is presented, if it's 50, if it could be equally Ogilvie as it could be Kelly, would a jury's determination choosing one or the other, in your mind, be just speculation? Or would it be based upon some facts? And I'm just trying to figure out what is the facts upon which a reasonable jury can base that inference. And you're anticipating an argument, Your Honor. I think, certainly at a summary judgment stage, I don't think it would be appropriate to foreclose the jury from the opportunity of looking at the testimony of both officers and decide who's telling the truth. And it very well could be the case that on cross-examination, the way they testify, the jury's saying, this guy's lying, this guy's telling the truth. That's why I think we should be in front of a jury in this case, Your Honor. You want to save some time for rebuttal, Mr. Dunham? You're into rebuttal time. It's up to you. I didn't even see the light here. I'm sorry, Your Honor. Yes, I do want to save time for rebuttal. Okay, we'll give you that time. Thank you. All right, let's hear from Ms. Kerner. Good morning. Good morning, Your Honors. May it please the Court, I will try, perhaps, to direct my discussion with respect to the questions you just posed to Plaintiffs' Counsel. First of all, I would ask that this Court to affirm the District Court in terms of all of its findings. First, that there was no Fourth Amendment violation, that the perusal of the notebook was not a Fourth Amendment violation. It was part of the reasonable reach of the inventory search, which was lawful. And I don't want to go over the facts, because obviously this Court is familiar with that. So in an inventory search of a car that has a briefcase in it, police would be entitled to pore through every page in the briefcase? Is that the logic of your position? Is that the logic of my position? Potentially.  Here's the situation, right? The reason why he has to peruse the notebook, and it's not committing anything to memory or looking for specifics or looking for evidence of other crimes. He's just looking for whether or not there's any basically pecuniary or bank account numbers or anything else that may be of value. They're leaving everything with the car. They're not taking it anywhere. Well, we have evidence that it actually wound up in DiMattei's house, right? That is what Mr. DiMattei testified to, yes. That's the evidence we need to accept on summary judgment, correct? Yes. Okay. So imagine my briefcase hypothetical. Well, then, Your Honor, in terms of the briefcase summary hypothetical, then you're right. I mean, taking a whole briefcase and a whole bunch of personal documents that might not have anything to do with the crime that they're investigating may be problematic. The issue here, though— It may be, yeah. Could you look at a cell phone that you collect? I don't believe so, Your Honor. Clearly not. Yes. I think you have to get a warrant for it. I mean, the questions that Judge Hamilton raised, I mean, an inventory search has to be to inventory items and then compile them. It can't be for investigative purposes, for developing evidence. True. Right? That's the line that the law has drawn so far. Correct. So it seems very hard to see how it would be permitted to open a briefcase and then to review its contents for purposes of taking an inventory. It would seem totally unnecessary. It would seem investigative in nature. Agreed. When you're talking about an entire briefcase, it would seem more investigative. But, again, when we're talking about these personal writings, that they were just, again, trying to determine if there was anything of pecuniary value in it. When you said earlier, though, that if they saw bank account numbers, I think that the flipping through the notebook for an inventory search is altogether different than what you're talking about. I think it's to see whether the notebook has narcotics in it, to whether the notebook has unexplained amounts of currency tucked in it. I don't think it's to read the notebook to see whether it's a drug ledger or whether there's bank account numbers or whether there's a list of kidnapping victims. I think that makes the perusal, which it's a fair term, that makes the perusal of it investigative in nature, not inventory. I believe, though, when the district court was looking at that issue in terms of perusal, he mentions that it would be illogical for the officer, in terms of its perusal, to ignore things that were in plain evidence or plain view of them, as this court's hired. Right. When Judge Hamilton posited that hypothetical earlier about, or maybe it was Mr. Dunham, about kind of bold-faced type, let's go kill somebody or let's go kidnap somebody, well, of course they're not going to ignore that. Right. Can you direct us to authority, though, that would allow the police to share the seized documents or their contents with other people? I cannot. I did not raise that issue in terms of the argument today or in terms of . . . That's sort of the core of this. It wasn't really addressed. Your qualified immunity argument to the district court didn't address that question. That would be accurate, Your Honor. I think I looked at it more in terms of the argument, in terms of affirming the district court, in terms of him finding, first of all, there wasn't a Fourth Amendment violation and that the appraisal of it wasn't any bigger Fourth Amendment. Let me just, for fun here, give you a variation on the facts. Let's suppose a celebrity has a one-car accident in Hollywood that knocks them out. Police officers respond to the scene. The driver is taken away to the hospital. The police tow the car and do an inventory search and find a diary. I assume you would agree with me that the Fourth Amendment would not allow them to give or sell that to a tabloid newspaper. Agreed. That would be a Fourth Amendment violation, probably also an invasion of privacy under tort law. Right. Okay, so we've got, but between the let's hurt these people and the celebrity's diary, we've got some middle ground here, right? Yes. So help me with case law or qualified immunity in between there. Well, with respect to the qualified immunity analysis, Your Honor, I mean, I don't believe that there is any case that would support a direct finding that a perusal of the notebook would have been outside the scope of the Fourth Amendment. I'm a little less worried about the perusal. You've got the plain-of-view argument that I am with. What I think we have to assume is that one of the officers showed the notebook to DiMattei or DiMattei. Actually, we don't have to assume that, Your Honor. Mr. DiMattei and Mr. Ward were there on scene with Mr. Gaddis before the Williams County sheriffs, who are my clients, ever showed up to investigate the claim. They had access to the car. They had access to the notebook. Do we have any evidence that that happened? No, DiMattei denied doing that. Exactly. Yes. This is on summary judgment. Correct. So please don't try to fight plaintiff's evidence at this point that suggests that one of the two deputies gave him the notebook. Fair enough. I'm sorry. I'm getting nervous. What was the question again, Your Honor? It wasn't really a question. I'm urging you to accept the plaintiff's evidence for purposes of summary judgment as we have to. Understood. All the question is doing is this. It just says take the facts, as Mr. Dunham has set them out, and just hold them constant, and then focus on law. So if you hold the facts constant, what Judge Hamilton's question is getting at is whether there's any law on the books that allows a law enforcement officer to take the property of someone and give it to another person, a private party. And here, further crediting the plaintiff's version of facts, saying review what I give you. That's the question. I don't know that. It's hard to maybe your point is that, well, there's no law saying that that is a clearly established violation, and it's the plaintiff's obligation when qualified immunity is asserted to come forward with law that would show a violation of clearly established rights. Maybe that's the answer. Perhaps. I think the other thing that we dealt with in terms of the underlying case is dealing with the U.S. versus Hudson matter that I cited, which was the situation where the officers took the plaintiff in that case to the emergency room and had the doctors force him to expel something that he had swallowed as part of evidence in their drug investigation. So the one thing that was present from U.S. versus Hudson was that the officers doing that with an independent citizen. So at this point in time, the officer is allegedly sharing it with a private citizen, which therefore then- I'll just be very transparent. Here's the challenge I have for both of you. Qualified immunity is a doctrine, and the U.S. Supreme Court has outlined its elements, whether we like them or we don't like the elements. The second prong of the qualified immunity test requires us to focus on case law at a high level of specificity. And the problem is that our discussion in the briefs and our discussion thus far in the courtroom is flying at an awfully high level of generality. And when you look at the briefs, we don't see discussions of case law. And we're not having discussions of case law in the courtroom, which is why we're resorting to hypotheticals. That's what makes this appeal difficult for a court of review, that when qualified immunity is on the table, we have to talk at high levels of particularity, whether we like it or not. Your Honor, in my research in the underlying court for the summary judgment motion, and then for today's purposes, I didn't find any specific case that would deal with the same factual situation that we had here. So, I mean, that's all we had was generalities, which is why qualified immunity should apply. And that's your answer. I mean, you can't prove negatives. I get it. Any other points you want to make, Ms. Kerner? No. I might ask you a question with regard to when the officer, whichever one it is, takes the notebook and presents it to Mr. Damati, even though he's a private citizen. In your mind, or I guess the question is, does that trans, to the extent that the inventory was, to the extent that the purpose of the search was inventory in nature before giving the notebook to Mr. Damati, when the officer decides to give the notebook to Mr. Nabhani, doesn't that turn that search into more of an investigative search rather than an inventory search? Because otherwise there is no reason for, in conducting the inventory, for the officer to give the notebook to Damati, right? And so at that point at least, at least the presenting of the notebook, that seems to me to be well beyond the scope of an inventory search as recognized by the Supreme Court. Yes, Your Honor. I think to the point that Your Honors have made this morning, at least with respect to my defense, the Lisbon County Sheriff's deputies, to the extent that they shared it with Damati, it was because they found his name in the document, in the diary or notebook, as you want to say, of Mr. Gaddis. And since Mr. Gaddis had showed up at Mr. Damati's house that day and was not expected to confront him about his underlying criminal cases, they may have been concerned that there was an additional reason for them to be heightened in terms of their awareness of what Mr. Gaddis would have been potentially, what his state of mind was in dealing with them. But we don't have any evidence of that, do we? No. Because they both say, we didn't do this. Correct. But we have Damati saying, I got the notebook. Somehow, some way, the notebook went from the car to the house. Somebody had to take it to him. And I guess I don't understand why the officer has to peruse a notebook in the first place. Why can't they just, I don't know, maybe I've been watching too many episodes of CSI, but why can't they just put it in an evidence bag and then just say, whatever's in there is in there? I believe that's part of the reason why they're doing the inventory search is to see if there's anything of value in it. Because they left it in the car. I understand, but why can't they just, like the briefcase scenario, why can't they just take the notebook as is and put the whole thing without opening it into a Ziploc bag? That would have been an option, and they could have had it taken with Mr. Gaddis. And so is the procedure for your client when there's a notebook, a container of any kind, to go through the container to see if there's anything else in there? What they're trying to do mostly is just protect themselves from any claims of damage or theft or anything else like that. So, I mean, that's why the briefcase analysis is tough in terms of if there are things of value in it, you want to make sure that you're being protected, that they have been removed, and that you know exactly what's in there. If Mr. Damani and Mr. Gaddis had potentially asked for the return or to bring the notebook with him, then perhaps we wouldn't also be here, that we would have taken it with him when he was being arrested to the jail, and it could have been marked as part of his property when they got there. So, anyways, thank you this morning for your honor's time. Okay, very well. Mr. Dunn, you had a little time left over. Thank you, Your Honors. The notebook begins at page 424 of the complete record, and it ends at page 4, looks like 480 of the complete record. Mr. Dunn, what I want to ask you about is part of the dialogue we were having with Ms. Kerner, and that is, do you agree, at least under qualified immunity law, that when qualified immunity is put on the table by a defendant, that the plaintiff is the one that has to show that there was a violation of a clearly established right? I think that is the standard, and I think I've acknowledged that in my brief. Okay, and do you agree that showing that there's been a violation of a clearly established right under current law requires you not to make constitutional arguments kind of just on the fly here, but to point to case law? Yes and no, Your Honor. Okay, the only no part of the exception that I get is if it's a completely obvious constitutional violation. We have two recent Supreme Court cases on that. Correct. But apart from an obvious constitutional violation, it has to be rooted in case law. I think, and I think in this case, I think it's obvious. Okay, both dimensions of the alleged Fourth Amendment violation, because that's why the two that we talked about when you were up here before, they're both obvious constitutional violations? I think the second one is obvious. Okay. The reason I'm pushing you on this... I get it. I hope not improperly, is because in your brief in the Qualified Immunity section, which is very, very short, there's not one citation to case law. Well, I do cite case law. Well, when you're analyzing on... Are you talking about in the district court? No, no, no. In the briefs that you filed in our particular court, okay, you say that, you know, at a general level, there needs to be a demonstration of a violation of an expectation of privacy. Well, right, right. I mean, that's just basically recounting the Fourth Amendment standard, but page 10 of your brief is where you're making the argument here about how Oglesby and Kelly can't escape liability, et cetera, but it's not accompanied by case law. So my final question is this. If you had to point us just one case, what case is most closely, factually analogous to the second part, to the second of the constitutional violations? The giving of the notebook to DeMatte, that part of it. What I have to do is I would have to cite to the district courts opinion the first case. I didn't bring it, but it's in there. And, of course, they cite it in their favor, but they talk about what an inventory search is, and then they also talk about an investigative search. Clearly, the second case that the district court cited, it was not an investigative search. It wasn't for purpose of gathering evidence. That's number one. And so then in the inventory search, that case is limited. And that's why I think it's... The question is, is the officers under fair warning? That's the standard as to what they, do they have the right, they do not have the right to give the notebook to DeMatte. And the law, in terms of inventory searches, is clear. It's limited to certain things, and they are, by negative implications, they do not have the right in inventory searches to go beyond what the inventory search rationale is and give the proceed to that search to somebody else. Okay. I think we understand your position. Thank you, Your Honor. I appreciate the question. Okay. Thanks to both of you. We appreciate it. We'll take the appeal under advisement. Thank you.